STATE OF ILLINOIS    )
                     )    SS
COUNTY OF COOK       )

## AFFIDAVIT OF MATTHEW A. FLAMM

MATTHEW A. FLAMM, being duly sworn on oath, deposes and states as follows:

1. I have personal knowledge of the facts set forth in this Affidavit. If called as a witness at trial, I would testify to those facts under oath.

2. I am an attorney at law in the State of Illinois and have been so licensed since 1978. I am President of Flamm, Teibloom & Stanko, Ltd. ("FT&S"), a Chicago law firm. FT&S has been in business since 1992.

3. My practice is concentrated in business and real estate litigation and in real estate tax sale and tax deed matters. I have twice been Chair of the Real Estate Taxation Committee of the Chicago Bar Association. I have spoken at seminars regarding delinquent real estate taxes, tax sales, and tax deeds.

4. FT&S represents many parties involved in tax sale and tax deed matters, including property owners, lenders, title insurance companies, municipalities, and tax purchasers.

5. We began representing Augustus Wright in 2001 and have represented him continually since then.

6. In 2003, Mr. Wright informed us that he had received a Warranty Deed for property located at 10951 S. Michigan Avenue in Chicago. We determined that real estate taxes on the property were delinquent and had been sold to a tax purchaser. The redemption period from the tax sale was scheduled to expire in July 2003. We advised Mr. Wright of those facts. At that time, Mr. Wright owed a substantial amount of attorney fees to FT&S.

SD: MAF:WRIGHT.MAF Affidavit.doc April 15, 2008

7. FT&S negotiated an agreement with the tax purchaser to extend the time within which Mr. Wright could pay the delinquent taxes on the Michigan Avenue property and retain title to it.

8. When the extension we had negotiated was nearing expiration, we still had not heard from Mr. Wright. Accordingly, FT&S negotiated an agreement with the tax purchaser whereby the tax purchaser would obtain a tax deed to the property and convey it to me or my nominee.

9. It was our intention that the agreement we had negotiated would be to the benefit of Mr. Wright. We anticipated that we would negotiate an agreement for him to obtain title through the tax purchaser, sell the property, and pay our outstanding fees and expenses from the proceeds of sale.

10. If we had not negotiated that agreement, Mr. Wright would have lost title to the property with no right to reimbursement or compensation.

11. In December, 2003, Mr. Wright informed us that he did not have sufficient funds to satisfy the agreement with the tax purchaser.

12. Accordingly, FT&S and Mr. Wright negotiated an agreement to acquire the property jointly. That agreement was reviewed and approved by Alvin G. Brooks, Jr., an attorney who had represented Mr. Wright for some time, because of the obvious conflict of interest created by our doing business with Mr. Wright.

13. The principals of FT&S provided the funds needed to acquire good title to the property from the tax purchaser. We caused title to be transferred into a land trust. Fifty percent (50%) of the beneficial interest in the land trust was owned by the principals of FT&S and the balance was owned by Mr. Wright's wife, Sherry Wright.

14. Mr. Wright expended a great deal of time and money rehabilitating the Michigan Avenue property. The principals of FT&S provided some funds to purchase materials, but Mr. Wright's contribution was far greater. This included repairing a plumbing leak and repairing the roof.

15. In December 2005, the property was sold to Christopher Furlow for a purchase price of $225,000.00. Mr. Furlow was a bona fide purchaser, unrelated in any way to any of the owners of the property. He was obtained through a real estate broker. None of us had had any prior contact with Mr. Furlow.

16. Mr. Furlow obtained his own appraisal and financing. Neither Mr. Wright nor any of the principals of FT&S had any involvement in the financing of the purchase.

17. When the property was sold, FT&S was reimbursed for its outstanding attorneys' fees and expenses. Other expenses incurred by the parties were reimbursed. The remaining proceeds were divided in accordance with the written agreement between the parties, half to Sherry Wright and half to the principals of FT&S.

18. Prior to the sale of the property to Mr. Furlow, there was at least one contract to purchase the property which did not go through to closing by reason of a default on the part of the purchaser. There also were other offers and negotiations which did not result in a contract being executed.

19. At some point during the ownership of the property, it was discovered that Mr. Wright had received a Warranty Deed from a party who was not then entitled to the property. The party who conveyed the property to Mr. Wright, Raymie Henderson, later obtained title to the property through a Quitclaim Deed dated November 25, 2002 and recorded December 3, 2002 in the office of the Cook County Recorder of Deeds as Document No. 0021330225.

20. Under the legal doctrine of after-acquired title, title to the property passed to Mr. Wright upon delivery of the Quitclaim Deed to Mr. Henderson, even though Mr. Henderson did not have title at the time he purported to convey title to Mr. Wright by Warranty Deed. 765 ILCS 5/7; *Pure Oil Co. v. Miller-McFarland Drilling Co.*, 376 Ill.486, 34 N.E.2d 854, 859-860 (1941).

21. Notwithstanding the fact that Mr. Wright did have legal title to the property, we had some concern about the insurability of title to the Michigan Avenue property. Since Mr. Wright still knew how to contact Mr. Henderson, we decided that the prudent thing to do would be to obtain a Quitclaim Deed from Mr. Henderson making clear that any interest he may ever have had in the property had been conveyed to Mr. Wright. We prepared and obtained such a Quitclaim Deed, which was dated February 7, 2003, and recorded April 24, 2003 in the office of the Cook County Recorder of Deeds as Document No. 0311410091.

22. The second Quitclaim Deed was of no legal force or effect, because Mr. Wright already owned the property through the doctrine of after-acquired title. The second Quitclaim Deed was obtained in an abundance of caution. No compensation or consideration exchanged hands between Mr. Wright and Mr. Henderson, as reflected by the fact that no real estate transfer tax was paid upon recording of the second Quitclaim Deed. In deed, that Deed stated that it was being recorded to "correct and modify previously recorded deed".

**FURTHER AFFIANT SAYETH NAUGHT.**

Matthew A. Flamm

Signed and sworn to before me this
15TH day of April, 2008.

_____
Notary Public

"OFFICIAL SEAL"
Kimberly J. Janiga
Notary Public, State of Illinois
My Commission Exp. 02/11/2009

SO: MAF:WRIGHT:MAF Affidavit.doc